# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Marvin Aspen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 8933 | **DATE** | 9/4/2002 |
| **CASE TITLE** | In Re: Aimster Copyright Litigation | | |

**MOTION:**  [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Enter Memorandum Opinion and Order: Plaintiffs' motion for preliminary injunction is granted. Plaintiffs are hereby ordered to submit proposed language for the preliminary injunction within 5 business days of this opinion. Defendants thereafter have two business days with which to submit any response to the proposed language. Pursuant to Rule 65(c), we also order plaintiffs to post a bond for the sum of $500,000 to compensate defendants for their losses in the event this injunction is reversed or vacated.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | SEP 0 5 2002 | |
| | Notified counsel by telephone. | | date docketed | 42 |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 9/4/2002 | |
| | Copy to judge/magistrate judge. | | date mailed notice | |
| GL | courtroom deputy's initials | | GL | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DOCKETED

SEP 0 5 2002

|  |  |  |
|---|---|---|
| In Re: Aimster Copyright Litigation | ) ) ) ) ) ) ) | Master File<br>No. 01 c 8933<br><br>Multi District Litigation #1425 |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, Chief Judge:

On November 17, 2001, the Judicial Panel on Multidistrict Litigation consolidated eleven cases in this court for pretrial proceedings under Multi-District Litigation number 1425 (master file 01-c-8933). Presently before us is a joint motion for preliminary injunction filed by several of those Plaintiffs (from cases 01-c-8940, 01-c-8941, and 01-c-8942) against the owner and operator of an Internet file sharing service called Aimster.[1] At issue is a service whose very *raison d'etre* appears to be the facilitation of and contribution to copyright infringement on a massive scale. Plaintiffs seek an injunction to prevent the contributory and vicarious infringement of their copyrighted works on Defendants' system and, for the following reasons, we grant their motion.

### I. FACTUAL BACKGROUND

**A. Defendants**

Aimster is a file sharing service that allows its members to identify large numbers of similarly situated users with whom they can transfer files in encrypted form and send instant messages. Aimster

---

[1] The Aimster software and service, which used to be provided through its website at www.aimster.com, has now been renamed "Madster," and is located at www.madster.com. To avoid confusion, however, this opinion will continue to refer to the software and system as Aimster.

1

is the brain child of Defendant John A. Deep, who also founded Defendant BuddyUSA, Inc. ("BuddyUSA") to develop the software and Defendant AbovePeer, Inc. ("AbovePeer") to operate the system (collectively, "Defendants"). Deep Decl. ¶ 2, n.1[2]; Pla. Brief at 3. Deep is the President and Chief Executive Officer of AbovePeer. Deep Decl. ¶ 1.

## B. Plaintiffs

The instant joint motion for preliminary injunction was filed by three sets of plaintiffs from three of the eleven cases currently pending under this multidistrict litigation. Most of the plaintiffs can be grouped into two broad categories. First, a number of plaintiffs representing various record companies (the "Record Company Plaintiffs") have invested substantial time, money, and resources to create, produce, manufacture, and sell recorded music. The myriad Record Company Plaintiffs (including, *inter alia*, BMG Music, Capitol Records, Inc., and New Line Cinema Corporation) own or control the copyrights in their sound recordings and are listed in an Appendix attached to Plaintiffs' Brief. Pla. Brief at 2. The Record Company Plaintiffs are each a member of the Recording Industry Association of America, Inc. ("RIAA"), a trade organization whose members account for approximately 90% of the sound recordings produced, manufactured, or distributed in the United States. Creighton Decl. ¶ 2. The second broad group of plaintiffs includes a number of songwriters and music publishers (the "Music Publisher Plaintiffs," including, *inter alia*, Jerry Lieber Music, Mike Stoller Music, and Famous Music Corporation) who compose and publish musical compositions and own the copyrights to the underlying music and lyrics of those musical works. The Music Publisher Plaintiffs own or control the copyrights

---

[2]Deep has filed a detailed declaration describing the Aimster system and various other facts pertinent to this case. Similarly, Plaintiffs have filed many (some quite lengthy) declarations with exhibits setting forth additional relevant facts. Throughout this opinion, declarations will be cited with the last name of the declarant followed by "Decl." and the paragraph or exhibit number. In some instances, declarants have filed supplemental declarations. Those supplemental declarations are cited with a "Supp."

to some very recognizable musical compositions, including "Jailhouse Rock," "My Favorite Things," and "Moon River."[3]

Together, the Music Publisher Plaintiffs and the Record Company Plaintiffs own or license the copyrights to a vast repository of music, including hit music by hugely popular artists like Madonna, Garth Brooks, the Backstreet Boys, the Beatles and Bob Dylan. Pla. Brief at 2. *See, e.g.*, Cotrell Decl. ¶¶ 3-6 (attaching many examples of Certificates of Copyright Registration on behalf of EMI Music Distribution); Eisenberg Decl. ¶¶ 3-6 (attaching many examples of Certificates of Copyright Registration on behalf of Sony Music); Ostroff Decl. ¶¶ 3-6 (attaching many examples of Certificates of Copyright Registration on behalf of Universal Music Group). According to Plaintiffs, the vast majority of their copyrighted musical works are available on the Aimster system for unauthorized transfer among its users in the manner described below. The Music Publisher Plaintiffs bring suit based upon the alleged infringement of underlying music and lyrics of their copyrighted songs. The Record Company Plaintiffs bring suit based upon their copyrighted sound recordings.

## C. General Background

Some of the basic technology underlying the present dispute is a matter of common knowledge and has been the subject of extensive factual findings by other courts. As such, it is not necessary to go into a detailed explanation of the nature and inner workings of the Internet, the World Wide Web, and digital compression technology (such as the widely used MP3 format). A full description can be found, by way of example, in *A&M Records, Inc. v. Napster, Inc.*, 114 F.Supp.2d 896 (N.D. Ca. 2000)("*Napster I*")[4], *RIAA v. Diamond Multimedia Systems, Inc.*, 180 F.3d 1072 (9th Cir. 1999)("*Diamond Multimedia*")

---

[3]*See* Complaint, *Jerry Lieber et al. v. AbovePeer et al.*, No. 01 c 8942.

[4]We note in passing that the *Napster* decision, while certainly persuasive on some points, is simply not precedential authority in this circuit. The parties expend a great deal of time and effort to convince us as to Aimster's similarities or differences *vis-a-vis* Napster. However, our decision today

or *Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997).

Before delving into a full description of the Aimster service, it is useful to describe some underlying concepts and technology. The first of such concepts is instant messaging. Instant messaging ("IM") is a way for people to communicate instantly over the computer to one or more 'buddies' that they specify. *See generally*, Mujica Decl. ¶¶5-7. There are several different IM networks, including America Online's Instant Messenger ("AOL IM"), ICQ, and Yahoo IM. Instant Messaging works through the use of a computer program that each individual user downloads to his or her machine. With the program installed, the computer connects to the IM network and the user can specify friends that also have the IM program installed on their computers. The system then alerts the user in real time whenever those friends are online. When a friend is online, the user can send that person an instant message that will pop up on their screen. The users can then chat back and forth in real time using their keyboards. As such, instant messaging is much faster than e-mail. An instant message pops up on the screen unbidden as soon as it is sent from a friend's computer.

AOL IM also has a feature that allows buddies to transfer files to each other.[5] There are two ways a AOL IM user can transfer files: by using a file transfer or AOL IM's "get file" functionality. A simple file transfer on AOL IM requires a user to specify a file on his hard drive to send to one of his IM buddies. The buddy, after signaling his acceptance of the transfer, would then receive the file onto his hard drive. This method of file transfer can be used to send any kind of files over the AOL IM network, including documents, digital pictures, and MP3 music.

---

need not rest on the legal reasoning or factual findings of the *Napster* courts.

[5]The file transfer functionality of AOL IM service is relevant only insofar as it relates to Defendants' argument that AOL has unclean hands and shouldn't be able to pursue a preliminary injunction. The crux of Defendants' argument is that AOL IM allows for substantially the same file transfer abilities of which the Plaintiffs now complain about Aimster. As explain in Section III.B.4, herein however, this claim is a red herring.

Another aspect of AOL IM's file transfer feature is the "get file" functionality. This function is the ability of a user to specify certain files or directories that are available for other users to freely take at their leisure. So, for instance, if an AOL IM user wanted to allow his friends to download any of the pictures located on his computer, he would simply specify to the AOL IM program that those buddies have access to those files. Anytime thereafter, the buddies could retrieve those files. That is, the user does not have to actually send those files to his buddies; the buddies could, rather, retrieve the files for themselves. According to Raul Mujica, Vice President and General Manager of the AOL service, AOL IM's "get file" functionality is limited in two respects. First, an AOL IM user can only access the files of an AOL IM user whose identity (or unique screen name) is already known to that user. Second, since AOL IM has no capability to search the files of other users, the user must know the particular file that is being sought from the other user's hard drive before that file can be fetched. Mujica Decl. ¶ 10. There is dispute between the parties as to the real differences between AOL IM's file transfer functionality and the functionality of Aimster. An analysis of that dispute can be found in Section III.B.4 below.

## D. The Aimster Service

### 1. Basic Operations

According to Deep, Aimster performs two fundamental functions. *See generally*, Deep Decl. ¶¶ 4-6. First, it allows its users to send messages or transfer files to other users by facilitating the creation of direct user-to-user (or peer-to-peer) networks. Through the use of encryption technology contained within the Aimster software, the individual users are assured of complete privacy in their online transaction. In particular, Deep claims that Defendants have no knowledge whatsoever of when its users are exchanging files, who are exchanging files, or what files are being exchanged. Deep Decl. ¶ 4. Aimster encrypts all the information that is transferred between its users on their private networks. Even the identities of such users are encrypted. Deep Decl. ¶ 8. While Deep admits that Aimster can

be used to transfer musical works (just as it can be used to transfer any other information or data) from one user to another, the subject matter of the transfer and the recipient are determined entirely by the users themselves. Deep Decl. ¶ 10. In short, Defendants go to great pains to characterize the Aimster service as merely an innocent provider of "infrastructure services" to end users, *Id.*, with the implication being that Aimster is not and should not be held responsible for the malfeasance, if any, of its end users.

According to Deep, virtually all "of the copyrighted musical works that Plaintiffs claim are being infringed by Defendants are songs that are transferred by individual users from one hard drive to another using Aimster solely as an internet service provider, in much the same way that such files can be and are transferred on AOL and other internet service providers." Deep Decl. ¶ 22.

Aimster's second fundamental function, according to Deep, is to allow users to identify other "buddies" who have similar interests and who may wish to correspond and exchange files. Deep Decl. ¶ 5. Users of the Aimster system locate buddies by searching the user profiles on the system. The user profile identifies other users by subject matter of interest or "by the name of the file or files that user has available on his or her hard drive." *Id.*

If Deep's declaration were the only means by which we could evaluate the Aimster system, we might be convinced that it is as innocent as Defendants claim. Unfortunately for Defendants, however, Plaintiffs have submitted numerous declarations to demonstrate that Deep's description of the Aimster service is less than complete.

Plaintiffs' characterization of the Aimster service is understandably more sinister than Deep's: "Aimster is a highly integrated system that connects people throughout the world (who otherwise would likely have no contact with one another) and *encourages* and *enables* them to make their music files, among other copyrighted works, available for copying and distribution in a single database index."

Creighton Decl. ¶ 3 (emphasis supplied).[6] The following description of the Aimster system (from Plaintiffs' perspective) is culled from the declarations of several individuals. *See* Creighton Decl. (from the RIAA); Farmer Decl. (Plaintiffs' independent computer expert); Forrest Decl. (Plaintiffs' attorney attaching hundreds of pages of screen shots from the Aimster system in action); Schafer Decl. (Plaintiff paralegal attaching screen shots of Aimster message boards and chat rooms); Cheng Decl. (Plaintiffs' attorney attaching Certificates of Copyright Registration and Aimster screen shots showing each corresponding copyrighted song available for download).

In order to use Aimster, prospective users must download the Aimster software from its website. Downloading and using the software (known as Classic Aimster) is free.[7] Once the software is installed and executed, Aimster piggybacks onto America Online's IM network and allows its users to communicate and share files with any other Aimster user currently online. Essentially, Aimster greatly expands the file transferring capability of AOL IM described above by designating every Aimster user as the "buddy" of every other Aimster user. In this way, every Aimster user has the ability to search for and download files contained on the hard drives of any other Aimster user (provided that the user has previously designated those files to be available for searching). The Aimster website also posts Terms

---

[6] The concept that Aimster catalogues all available files for download in a single, centralized database is hotly contested by the parties. The reason for this debate is that a critical aspect of the *Napster* decision was that Napster operated a central directory of all the files available on its system. According to Deep, "Aimster contains no such central database." Deep Decl. ¶ 15. Plaintiffs disagree. See Creighton Decl. ¶ 3; Farmer Decl. ¶ 21-22. In the absence of an evidentiary hearing (which, as described below, we were precluded from holding by the Bankruptcy Court), we find that there is insufficient evidence to resolve this conflict. However, our decision today can be and is based upon considerations independent of this evidentiary insufficiency. In other words, the reasoning in this opinion would hold regardless of whether or not Aimster maintains a central database of files available for transfer.

[7] Evidence suggests, however, that this is no longer the case. Efforts to download the software for free now bring a user to a page requiring registration with Club Aimster (described below) and the payment of a $4.95 fee. *See* Farmer Supp. Decl. ¶ 9.

of Service, to which every Aimster user putatively agrees before using Aimster. The Terms of Service specifically state that Aimster will disable the access of users who repeatedly violate copyright law. *See* Forrest Decl. Ex. 19 (screen shot of Copyright Notice).

The method by which Aimster accomplishes its purpose is quite simple. Once logged onto the Aimster system, a user need only type in a file search to be presented with a list of all Aimster users currently online (up to 500) who have files meeting the search criteria on their hard drive available for download. For example, a user seeking an MP3 of Paula Cole's "I Don't Want to Wait" (a song whose copyright is owned or controlled by Plaintiffs, *see* Cheng Decl. Ex. 1) need only type in "I Don't Want To Wait" into the Aimster search field to be presented with all buddies online that currently offer that song for download. *See* Cheng Decl. Ex. 2 (showing screenshot of the "I Don't Want To Wait" search and a listing of available files for download). Users also have the ability to do more advanced searches. The Aimster software allows searching to be restricted by file type and bit rate. The search results provided by the Aimster software show the file name and other file characteristics directly pertinent to the distribution of MP3 files (such as file size, bit rate, frequency, and song length). Notably, the software also provides the unique screenname of the buddy who currently possesses the file.[8]

Once the search for a suitable file is complete, a user need only click on the file name title and then click on the "Download" button to obtain a copy of the song. At that moment, the Aimster system facilitates the connection of its two users through a private, encrypted network and the file is transferred between them. During the copying of a file, the Aimster system provides a constant update about the status (including the progress, the rate of transfer, the time remaining) of each download or upload.

---

[8] It is important to remember throughout this discussion that Aimster does not itself store all of the music (or other) files made available through a search on its system. Rather, each file is stored on the individual hard drive of the Aimster user's computer itself. There is, however, some question as to the amount of file "caching" (or temporary storage of material to facilitate further distribution) on the Aimster system. This activity, to the extent it is relevant, is described below in Section III.B.5.d.

While any Aimster user is on the Aimster system, the files that that user previously designated as available for transfer are available for searching and downloading by any other Aimster users. Thus, while an Aimster user is searching for files to transfer *into* his or her harddrive, other Aimster users are able to search for and download files *from* that user's harddrive. In this way, an Aimster user with copyrighted music files on his harddrive available for download can thereafter become an unauthorized *distributor* of that copyrighted music as soon as another Aimster user initiates a transfer of that file. All of the searching for and transfers of files on the Aimster system is accomplished without a searching user needing to know the location or identity of any other individual or specific Aimster users.

In addition, Aimster provides the ability to automatically resume transfers of files that, for whatever reason, are interrupted. For example, in a transfer between two Aimster users of the Paula Cole song described above, it is a requirement that both users remain online during the entire transfer. The transfer is interrupted if the source user goes offline or otherwise terminates the transfer at any time before its completion. Aimster solves this problem by automatically reconnecting the searching user to a identical song or file located elsewhere on the hard drive of a different Aimster user and automatically resuming the transfer at the point at which it was previously terminated.

After a file transfer is completed, the transferred song or file is copied to the retrieving user's hard drive. At that point, both the retrieving user and the source user have a copy of the file that is thereafter further available for searching and transfer by other Aimster users.

2. Guardian Tutorial

Also located for a time on Aimster's website was a feature or utility called "Aimster's Guardian Tutorial."[9] This tutorial, located on (but since removed from) Defendants' web site, methodically

---

[9]It is unclear from both parties' submissions whether "Guardian" was another version of the Aimster software, or merely a separate feature of the existing code.

demonstrated how to transfer and copy copyrighted works over the Aimster system. It accomplished this goal by using, as illustrative on-screen examples, some of the very copyrighted works that Defendants had previously been informed were being infringed on the Aimster system. *See* Creighton Decl. ¶ 13, Ex. 12 (including screen shots of the Guardian tutorial printed from the Aimster web page); Farmer Decl. ¶ 25.[10]

### 3. Chat Rooms and Bulletin Boards

Aimster's service includes message (or bulletin) boards on which Aimster users would regularly post messages to each other. Schafer Decl. ¶ 3, Ex. 1 (containing screen shots of bulletin board messages). The discussions on these bulletin boards generally fell into a range of particular topics, including: (1) Aimster users seeking to download copyrighted recordings ("I'm trying to find downloads from the Purafunalia album. Specifically the song Blast" (posted by SeanKoury, July 4, 2001)); (2) Aimster users offering recordings for download ("I have a lot of hip hop shared at all times when I'm on, usually over 500 MP3s... [F]eel free to get whatever you want" (posted by biggvince, July 17, 2001)); (3) Aimster as an alternative to Napster ("I'm a long time Napster user, with about 900 MP3s...like everyone else, the RIAA has forced me to try other mp3 websites, so here I am" (posted by honey, March 17, 2001), "Use Aimster like Napster" (posted by Marcella42, May 27, 2001)); (4) comments on

---

[10]In a declaration filed by Deep subsequent to oral argument on this motion, he has reiterated his position that the "Guardian Tutorial" was not prepared or placed on the Aimster website by any Defendant or their agents. Rather, the "Guardian Tutorial," according to Deep, appeared on a website called "Our Aimster" created by an individual who was not an employee or agent of Defendants. Deep claims that the creators of "Our Aimster" asked, and Defendants agreed, that the "Our Aimster" site contents would be cached onto the Aimster web site. But, claims Deep, it was not until Plaintiffs submitted their papers on this motion that he was aware of the contents of that site. Upon becoming so aware, he immediately disabled access to the "Our Aimster" material through the Aimster website. But Plaintiffs, in their response to Deep's additional declaration, point out the Guardian Tutorial was accessible from and existed on the Aimster system from at least August 16, 2001 until at least January 2002. Moreover, the screen shots of the "Guardian Tutorial" unequivocally show that it was accessible from, and was a part of, Aimster's web page. We find Deep's contention that the Defendants "were unaware of the content of the tutorial" (Deep 7/25/02 Supp. Decl. ¶ 6) simply unbelievable.

the illegality of sharing copyrighted music files ("What you have with Aimster is a way to share, copy, listen to, and basically in a nutshell break the law using files from other people's computers.... I suggest you accept aimster for what it is, an unrestricted music file sharing database" (posted by zhardoum, May 18, 2001)); and (5) bashing of the music industry and the RIAA ("LET'S ALL FUCK OVER THE MUSIC INDUSTRY. . . LETS CHEAT THE VERY ARTISTS WE LISTEN TO" (posted by poiuytrewqm May 20, 2001), "I AM NOT GOING TO BUY CDS ANYMORE!" (posted by OKOK, October 9, 2001)). *See, generally,* Schafer Decl. Ex. 1 (attaching screen shots).

In addition, Aimster allows for real-time chatting between buddies on online chat rooms in the Aimster system. Screen shots of the conversations in these chat rooms reveal that a frequent discussion among the users is the exchange of music files. *See* Schafer Decl. Ex. 2.

4. Club Aimster

Around November 2001, Aimster launched a new service called Club Aimster. Club Aimster is a repackaged version of the basic Aimster service that great enhances the ability of its members to locate and download copyrighted music. It accomplishes this goal by providing, for a $4.95 monthly fee), "All the Hot New Releases All The Time." Forrest Decl. Ex. 18 (screen shot of Club Aimster introductory page).

To use Club Aimster, members must pay their monthly fee, download the Club Aimster software, and log-on to the site with a unique member name and password. Forrest Decl. Ex. 19 (screen shots of the log-in page and download page). Users are thereafter presented with a list of "The Aimster Top-40" – a list of the 40 "hot new releases" most frequently downloaded by Aimster users, virtually all of which are owned by Plaintiffs. Creighton Decl. ¶ 14 and Ex. 13. *See also* Forrest Decl. Ex. 19 (screen shots of the Aimster Top 40). The Aimster Top 40 includes the song and artist name of each selection, a review of the selection (apparently written by Defendants), the Aimster ranking, and the

current "Labels" ranking.[11] Finally, each Aimster Top 40 selection includes a "Play" button that a user can click to automatically begin the copying and transfer of that particular song to the member's computer. In this way, Club Aimster seamlessly allows for the distribution of copyrighted music without even the inconvenience of having to type in an Aimster search request – Club Aimster, in short, "takes the search out of searching." Farmer Decl. ¶ 26.[12]

Several screen shots from the Club Aimster service are found in the Forrest Declaration at Exhibit 19. The number one selection on the Aimster Top 40 on the date listed (October 25, 2001) is the song "Hero," by Enrique Iglesias. The current "Label" ranking of the song is listed as number nine but the written review of the song states that "This song will be #1 on the Labels' Chart in about 2-4 weeks." Forrest Decl. Ex. 19. To download "Hero," a user need only click on the Play button situated next to the listing. Other songs available through one-click downloading on Club Aimster (as of October 25, 2001) include "I am a Slave 4 U," by Britney Spears, "Family Affair," by Mary J. Blige, "Turn Off the Light," by Nelly Fertado, and "You Rock my World" by Michael Jackson.

The vast majority, if not all of the music available for copying on Club Aimster is owned by Plaintiffs and is listed in the Billboard Hot 100. Creighton Decl. ¶ 14.

5. Commercial Aspects

Defendants, according to Deep, "do not sell anything on or through their service. Except for the

---

[11]Presumably, the "Labels" ranking is based upon the song's current ranking on the Billboard Hot 100. *Billboard* is a leading periodical in the music field, is widely available, and is used by music professionals worldwide. On a weekly basis, *Billboard* prepares a list of 100 recordings receiving the most radio air play and retail sales. *See* Creighton Decl. ¶ 18.

[12]By stark contrast, Deep's description of Club Aimster leaves out these most egregious details and describes the service in purely innocuous terms. While "Plaintiffs make much of the existence of Club Aimster," he says, it is "merely reporting to Aimster users the popularity of individual songs. . . Those individuals who wish to listen to songs listed on Club Aimster must still click onto a search request for the song title." Deep. Decl. ¶ 21.

services provided through Club Aimster, which accounts for a very small portion of the traffic on Defendants' service, there is not money exchanged for any service and there is no paid advertising on the site." Deep Decl. ¶ 20. This description of Aimster's commercial aspect is inaccurate.

In the time since the filing of Deep's original Declaration, it appears that Club Aimster now accounts for significantly more than "a very small portion of the traffic on Defendants' service." On the contrary, any attempt to download the Aimster software now requires that a prospective user join Club Aimster and pay the $4.95 monthly membership fee. This limitation exists despite text on the Aimster homepage stating that one need not be an Aimster member to download and use Classic Aimster. *See* Farmer Supp. Decl. ¶ 9, Ex. 1 (including description of thwarted attempt to download the Aimster software for free and appropriate screen shots). As such, it now appears that every user of the Aimster system is required to join Club Aimster and pay the monthly fee. Aimster is very much a commercial enterprise. Users are expected to pay $4.95 per month for the privilege of "hours of entertainment every day." Forrest Decl. Ex. 19.

As further evidence of Aimster's commercial nature, Plaintiffs also attach screen shots from the Aimster web page offering various merchandise for sale. This merchandise includes Aimster Jeans, Designer Fragrance, Nutritional Supplements, and bottles of "Fat Metabolizer." *See* Creighton Decl. Ex. 23 (attaching screen shots).

There is another, if minor, commercial aspect to Aimster. Defendants' website actively solicits for $10 "voluntary payments" to benefit Aimster's "Fight For Freedom" against "the Recording Industry, the Motion Picture Association and America Online in court to protect [Aimster users'] rights to privacy and free speech." In return for their $10 payment, contributors were to receive an Aimster "Fight for Freedom" poster. *See* Forrest Decl. Ex. 2 (screen shot of the "Fight For Freedom" web page).

6. Availability of Music on Aimster

Plaintiffs have provided abundant documentary evidence of the vast amounts of copyrighted music available on Aimster system. By way of example, Plaintiffs' representatives on the Aimster system conducted searches for and downloaded the music of every single recording on the November 3, 2001 Billboard Hot 100. Creighton ¶ 18, Ex. 19. Plaintiffs also searched for and downloaded every single Top 10 recording from the period between November 5, 2000 and November 3, 2001. Creighton ¶ 18, Ex. 20. Furthermore, Plaintiffs demonstrate that at least one recording from every album certified as Gold or Diamond between November 1, 2000 and October 31, 2001 was available on the Aimster system. Creighton ¶ 18, Exs. 21-22. Virtually all of the referenced recordings are owned or controlled by Plaintiffs. *Id.*

## II. PROCEDURAL BACKGROUND

Following threatened legal action by the RIAA against Defendants for the rampant copyright infringement on the Aimster system, Defendants AbovePeer and BuddyUSA each filed separate complaints for declaratory relief against the RIAA in the United States District Court for the Northern District of New York on April 30, 2001. Thereafter, between May 24, 2001 and November 2001, numerous additional actions were commenced in the Southern District of New York, the Central District of California, the Middle District of Tennessee, and the Southern District of Florida. In July 2001, Plaintiffs, according to Deep, moved to consolidate and coordinate for pretrial proceedings all of the actions regarding Aimster before the Judicial Panel on Multidistrict Litigation ("MDL Panel"). On November 16, 2001, the MDL Panel found that consolidation of the cases would "serve the convenience of the parties and witnesses and promote the just and efficient conduct of [the Aimster litigation]." Transfer Order at 2. The MDL Panel further concluded that this court would be a convenient, central forum given that the forums for the underlying cases were scattered throughout the country.

On December 21, 2001, Plaintiffs filed the instant motion for preliminary injunction. Defendants filed their opposition to the preliminary injunction on January 22, 2002. Both parties thereafter filed numerous pleadings and supporting material. The motion for preliminary injunction and Defendants' opposition has now been fully briefed since March 2002.

A status conference was set in this court for March 19, 2002 to discuss the parties' proposals for a case management plan and schedule a date for oral argument on the preliminary injunction. On March 11, 2002, however, prior to the status conference, Defendant John Deep filed for bankruptcy protection under Chapter 13 of the United States Bankruptcy Code. Thereafter, both corporate Defendants filed for bankruptcy under Chapter 11. With all Defendants in bankruptcy proceedings, these proceedings were stayed under the automatic stay provisions of the Bankruptcy Code pending a determination of Debtors' rights in the Bankruptcy Court for the Northern District of New York.

On May 1, 2002, Plaintiffs herein filed a motion with the Bankruptcy Court for relief from the automatic stay provisions to the extent necessary to allow our court to rule on the pending and fully briefed motion for preliminary injunction. On May 23, 2002, the Bankruptcy Court, Judge Littlefield, held a hearing on the motion and, on June 18, 2002, granted the motion by written opinion and order.

Bankruptcy Judge Littlefield's order lifting the automatic stay limits us in the manner we are permitted to proceed. His order specifies that the automatic stay is lifted "for the limited purpose of permitting [the movants, Plaintiffs herein] to request the MDL Court to issue its decision on the pending preliminary injunction motion, without any further hearings other than oral argument of or conferences regarding the merits of the motion." *In Re John A. Deep, In Re AbovePeer, Inc., In Re BuddyUSA, Inc.*, Nos. 02-11552, 02-11745, 02-11755, slip op. at 12 (Bankr. N.D.N.Y. June 18, 2002). As such, by the very terms of Judge Littlefield's order we were precluded from holding any evidentiary hearings on the pending motion.

Seizing on this language, Defendants, on June 21, 2002, moved that we refer the motion for preliminary injunction back to the Bankruptcy Court in the Northern District of New York. The basis for Defendants' motion to transfer was that the preliminary injunction could not be decided without an evidentiary hearing to better determine the facts of the case and that such an evidentiary hearing was specifically prohibited by the Bankruptcy Court. On July 18, 2002, however, we denied Defendants' motion to transfer finding that the "evidence presently before us is sufficient at this preliminary stage of the proceedings." In short, we felt that, given the length and comprehensive nature of the parties' submissions, an evidentiary hearing was unnecessary. In fact, we would likely have decided the present motion without an evidentiary hearing even in the absence of Judge Littlefield's limiting order.

On July 24, 2002, the parties presented oral argument on the motion for preliminary injunction. All that remains is a decision by this court on the motion and the parties can return to the Bankruptcy Court for further proceedings.

### III. ANALYSIS

#### A. Preliminary Injunction Standard

A preliminary injunction "is an extraordinary and drastic remedy." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Its purpose is to minimize the hardship to the parties pending the ultimate resolution of their lawsuit. *Anderson v. U.S.F. Logistics, Inc.*, 274 F.3d 470, 474 (2001). Generally, a party moving for a preliminary injunction must show that (1) its case has some likelihood of success on the merits; (2) that no adequate remedy at law exists; and (3) it will suffer irreparable harm if the injunction is not granted. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001). If all three conditions have been met, we must balance the harms the non-moving party will suffer if the injunction is granted against the irreparable harm the moving party will suffer if the injunctive relief is denied. *Id.* Finally, we must consider whether granting or denying the injunction will harm the public interest. *Id.*

The Copyright Act authorizes injunctive relief in situations where it is reasonable for the purposes of restraining or preventing infringement of copyright. 17 U.S.C. § 502(a). Irreparable injury may normally be presumed from a showing of copyright infringement. *Atari Inc. v. North Am. Phillips Consumer Elec. Corp.*, 672 F.2d 607, 620 (7th Cir.), *cert. denied*, 459 U.S. 880 (1982). In addition, the public interest may favor the grant of a preliminary injunction because copyright laws embody a policy of encouraging creativity. *See, e.g., ISC-Bunker Ramo Corp. v. Altech, Inc.*, 765 F.Supp. 1310, 1333 (N.D. Ill 1990) *citing Atari*, 672 F.2d at 620.

**B.      Likelihood of Success on the Merits**

Musical compositions and sound recordings are protected by the Copyright Act. 17 U.S.C. §102(a)(2); *Goldstein v. California*, 412 U.S. 546,552 (1973). Copyright owners, by definition, have the exclusive rights to copy and distribute their copyrighted works. 17 U.S.C. § 106(1) & (3). To establish direct copyright infringement, a plaintiff must prove two elements: (1) ownership in the applicable copyright(s) and (2) unauthorized copying by the defendant of the constituent elements of the work that are original. *Feist Pub., Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991). Contributory copyright infringement, by contrast, stems from the notion that one who contributes to another's direct infringement should be held accountable. *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir. 1995). As such, the first step in assessing the existence of contributory infringement is determining the existence of the underlying and direct infringing activity by a third party – in this case, Aimster's users.

**1.      The Existence of Direct Infringement**

As a threshold matter, Plaintiffs must demonstrate that Aimster's end users are themselves engaged in direct copyright infringement. Copyright infringement, as noted above, requires a showing by the Plaintiffs that (1) they own the applicable copyrights and (2) there was unauthorized copying of

the elements of the work that are original. *Feist Pub.*, 499 U.S. at 361. Furthermore, there is no doubt that input of a copyrighted work onto a computer constitutes the making of a copy under the Copyright Act. *NLFC, Inc. v. Devcom Mid-America, Inc.*, 45 F.3d 231, 235 (7th Cir.), *cert. denied*, 515 U.S. 1104 (1995).

Plaintiffs have unequivocally established that Aimster's users are engaged in direct copyright infringement. Plaintiffs have submitted convincing evidence that they own or control the copyrights for works copied and distributed using the Aimster system. Plaintiffs' declarants have attached copyright registration certificates demonstrating their ownership or control of the copyrights for hundreds of works found to be available through the Aimster system . *See* Agnew Decl. ¶ 3; Cottrell Decl. ¶¶ 3-6; Eisenberg Decl. ¶¶ 3-6; Leak Decl. ¶¶ 3-5; Ostroff Decl. ¶¶ 3-6; Seklir Decl. ¶¶ 3-7.

Defendants, in their brief and at oral argument, do not dispute that unauthorized copying of copyrighted works occurs on the Aimster system by Aimster's end users. Indeed, during oral argument, Defendants' counsel, George Carpinello, admitted several times that the Aimster system is used to transfer music. *See, e.g.,* Oral Argument Tr. at 32 ("Granted, [Aimster is] also being used to transfer music. There's no question about that. Again, like any other peer-to-peer system, it's being used for that.").

Instead of disputing the existence of direct infringement by Aimster's users, Defendants assert that the provisions of the Audio Home Recording Act of 1992 (the "AHRA") act as an affirmative defense.

The AHRA forbids actions based on the non-commercial use of a device to record digital or analog music recordings. 17 U.S.C. § 1008. The main purpose of the AHRA was "to ensure the right of consumers to make analog or digital audio recordings of copyrighted music for their private,

noncommercial use." *Diamond Multimedia,* 180 F.3d at 1079 (quoting S. Rep. 102-294 (1992) *reprinted in* 1992 WL 133198).

According to Defendants, the AHRA shields them from liability because the AHRA was intended to immunize from liability personal use of copyrighted material by "protecting *all* noncommercial copying by consumers of digital and analog musical recordings." Def. Brief at 8, *citing Diamond Multimedia,* 180 F.3d at 1079. While Defendants do not elucidate this argument in their brief, they apparently believe that the ongoing, massive, and unauthorized distribution and copying of Plaintiffs' copyrighted works by Aimster's end users somehow constitutes "personal use." This contention is specious and unsupported by the very case on which Defendants rely.

In *Diamond MultiMedia* the Ninth Circuit affirmed the denial of a preliminary injunction against the manufacturer of a hand held device, called the Rio, capable of receiving, storing, and re-playing MP3 music files. 180 F.3d 1072. Users of the Rio were able to transfer MP3 files already located on their computer to the Rio so that the songs could then be played elsewhere without the need for the computer. The Rio was not capable of further distributing the music to other computers. Rather, it was solely used as a means by which a user of MP3 files could make further private and personal use of those files away from his or her computer. The RIAA brought suit to enjoin the Rio, claiming it did not meet the requirements of the AHRA. Specifically, the RIAA wanted to prevent the sale of the Rio because it did not employ a Serial Copyright Management System as required by the AHRA. In finding that the RIAA did not have a likelihood of success on the merits, the Ninth Circuit found, *inter alia,* that the Rio was not a "digital audio recording device" under subject to the AHRA.

The facts of the instant case and *Diamond Multimedia* are markedly different. The activity at issue in the present case is the copying of MP3 files from one user's hard drive onto the hard drive of another user. The Rio in *Diamond Multimedia,* by contrast, "merely [made] copies in order to render

portable, or 'space shift,' those files that already reside on a user's hard drive." 180 F.3d at 1079. The difference is akin to a owner of a compact disc making a copy of the music onto a tape for that owner's sole use while away from home versus the owner making thousands of copies of the compact disk onto a tape for distribution to all of his friends. Furthermore, *Diamond Multimedia* had nothing whatsoever to do with whether the MP3 files on the owner's computers themselves infringed copyrights. Rather, the decision was limited solely to the infringement issue regarding the act of shifting files from a computer to a personal device and whether that copying was subject to the particular requirements of the AHRA. In short, Defendant's reliance on *Diamond Multimedia* is entirely misplaced.

## 2. Contributory Infringement by Aimster

Having shown direct infringement by Aimster users, Plaintiffs must next demonstrate a likelihood of success on their contributory infringement claim. A party can be liable for contributory infringement where the party "with knowledge of the infringing activity, induces, causes, or materially contributes to the infringing conduct of another." *Design Craft Fabric Corp. v. K-Mart Corp.*, 98 C 5698, 1999 WL 1256258, at *4 (N.D. Ill. 1999) (*quoting Gershwin Publ'g Corp. v. Columbia Artists Mgt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971)).

### a. Knowledge of Infringing Activity

The imposition of contributory liability requires that the secondary infringer know or have reason to know of the direct infringement. *See A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1020 (9th Cir. 2001)("*Napster II*"); *Cable/Home Comm. v. Network Prods., Inc.*, 902 F.2d 829, 846 (11th Cir. 1990).

There is no doubt that Defendants either know or should know of the direct infringement occurring on the Aimster system. Plaintiffs have sent repeated notices to Defendants of the obvious infringing activity on Aimster. On April 3, 2000, Frank Creighton of the RIAA sent a cease-and-desist

letter to Defendants in which he detailed the availability of copyrighted works on Aimster. Creighton Decl. ¶ 7, Ex. 8. Again, on May 9, 2001, Mr. Creighton sent a cease-and-desist letter to Defendants, this time including screen shots showing approximately 2900 sound recordings owned or controlled by RIAA members available for download through Aimster. Creighton Decl. ¶ 10, Ex. 11. On November 26, 2001, Mr. Creighton sent a third letter to Defendants again demonstrating the existence of unauthorized sound recordings available through Aimster and specifically mentioning Club Aimster. Creighton Decl. ¶ 14, Ex. 13.

Aimster's Guardian Tutorial is further evidence of Defendants' knowledge of infringing activity. The Tutorial was available on the Aimster web site and methodically demonstrated how to infringe Plaintiff's copyrights by using specific copyrighted titles as pedagogical examples. Defendants' service, moreover, included online chat rooms and bulletin board systems in which Aimster users openly discussed trafficking in copyrighted material and "screwing" the RIAA. Each of these elements, taken together or even individually, would conclusively demonstrate Defendants' knowledge of the infringing activity taking place on the Aimster system. *See, e.g., Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 261 (9th Cir. 1996) ("no question" that plaintiff adequately alleged the element of knowledge in contributory copyright infringement claim where the sheriff had sent letters notifying the defendant that infringing materials were being sold at defendant's swap meet).

Club Aimster provides further evidence of Defendant's knowledge of infringement. With Club Aimster, Defendants actually comment upon and track the top copyrighted sound recordings available on Aimster. The "Aimster Top 40," available to users through Club Aimster, not only provides users with an easy way to locate and download copyrighted material, but it even makes reference to where each particular song is ranked on the Aimster list *vis-a-vis* the music labels' lists. See Forrest Decl. Ex 19.

21

In short, the letters to Defendants by the RIAA, the existence of the Guardian Tutorial, the activity on Aimster's chat rooms and bulletin boards, and the operation of Club Aimster all demonstrate that Defendants have actual knowledge of the infringing activity.

Despite this overwhelming evidence, Defendants point to a technical attribute of the Aimster system that, they say, prevents them from having such knowledge. According to Deep, the Aimster system encrypts the data sent between the users' computers such that Defendants are never aware of which users are actually transferring which files. Defendants argue that, "every communication between and among users is encrypted. Just like an electronic bank or financial transaction, only the parties to the transaction have access to the transmission." Def. Brief at 10. The crux this argument is that, while Plaintiffs may be able to point to specific users on the Aimster system that have copyrighted material available on their individual hard drives, Plaintiff cannot show, nor can Defendants actually be aware of, specific transfers of such material between Aimster's users. This limitation exists because Aimster itself encrypts the communications between its users so that no one but those users are aware of what files are being transferred. Thus, according to Deep, "Defendants have no knowledge of when an exchange takes place, who is exchanging information[,] or what information is being exchanged." Deep. Decl. ¶ 4.

Defendants' encryption argument, clever though it may be, does not convince us that they lack actual knowledge of infringement. It may be true that, due to Aimster's encryption scheme, Defendants are unaware of the actual specific transfers of specific copyrighted music between specific users of the Aimster system. However, there is absolutely no indication in the precedential authority that such *specificity* of knowledge is required in the contributory infringement context. Plaintiffs have provided defendants with screen shots of the Aimster system showing the availability of Plaintiffs' copyrighted sound recordings on those users' hard drives. Forrest Decl. Ex. 20. The screen shots unequivocally

22

identify the individual users ("buddies") who possess the offending files. *Id.* Each of these individually identified users must log on to the Aimster system with a password and user name provided by Aimster. Forrest Decl. Ex. 19 (screen shot of the Aimster login screen). While it may be true that the actual transfers between users are unknown to Defendants due to Aimster's encryption scheme, it is disingenuous of Defendants to suggest that it is unaware of which users are using its system and what files those users are offering up for other users to download at their whim. It is also disingenuous of Defendants to suggest that they lack the requisite level of knowledge when their putative ignorance is due entirely to an encryption scheme *that they themselves put in place*.

Even if we were to agree that the encryption on Defendants' system prevents them from having actual knowledge of infringement, the encryption scheme would not prevent Defendants from having constructive knowledge. Constructive knowledge may also meet the knowledge requirement of a contributory infringement claim. *See Gershwin Publ'g Corp.*, 443 F.2d at 1162. Here, given the facts described above, Defendants clearly should have been aware of the infringing activity. Such constructive knowledge suffices for our purposes.

      b.     <u>Induce, Cause, or Materially Contribute To The Infringing Activity of Another</u>

Plaintiffs have also successfully shown that Defendants materially contribute to the underlying infringement by Aimster's users. Here, the Ninth Circuit's reasoning in *Fonovisa*, 76 F.3d 259, is illustrative. In that case, the court held that the owners of a swap meet or flea market could be held contributorily liable for the infringement of individual vendors in the swap meet when those vendors were trafficking in counterfeit musical recordings. In finding that the swap meet organizers materially contributed to the infringing activity of the vendors, the court reasoned that "it would be difficult for the infringing activity to take place in the massive quantities alleged without the support services provided by the swap meet." *Id.* at 264. Those services included "the provision of space, utilities, parking,

advertising, plumbing, and customers." *Id.* Relying on *Fonavisa*, the district court in *Napster I* (dealing with a file sharing service, Napster, markedly similar to the Aimster service) found that the provision of services by Napster were analogous to the provision of services in *Fonovisa. Napster I*, 114 F.Supp.2d at 919. Such services provided by Napster included supplying "the proprietary software, search engine, servers, and means of establishing a connection between users' computers." *Id.* Furthermore, without the support services offered by Napster, its users "could not find and download the music they want." *Id.*

Here, too, we rely on *Fonovisa* to support our finding that Defendants have materially contributed to infringing activities. Instead of parking spaces, advertisement, and plumbing, Defendants in this case have provided the software and the support services necessary for individual Aimster users to connect with each other. Without Aimster's services, Aimster's infringing users would need to find some other way to connect. We need not solely rely on such "but for" causation, however, for Defendants go much further. The very existence of Club Aimster demonstrates the extent to which Defendants contribute to infringing activity. The Aimster Top 40 catalogues and presents for Aimster users the top copyrighted music that they may wish to transfer. It comments upon that music and, in some cases, even suggests that the user *should* have it. *See, e.g.,* Forrest Decl. Ex. 19C ("Aimster Sayz (sic): Anybody that oWns this, maybe you could be my hero..."). What's more, users wishing to download music using Club Aimster need merely click on a play button and the Aimster software automatically creates a connection with another users' computer to facilitate the transfer. As stated by Plaintiffs in their brief, "Aimster predicates its entire service upon furnishing a 'road map' for users to find, copy, and distribute copyrighted music." Pla. Brief at 13. We agree. Defendants manage to do everything but actually steal the music off the store shelf and hand it to Aimster's users.

i.    Unintended Effect

Instead of directly arguing against this point, Defendants urge us to consider that Plaintiffs

reasoning would have the collateral, unintended effect of making liable *every* Internet service provider

as long as the provider's service could be said to be the "but for" cause of the infringing activity of some

of its users. "If Aimster were held to materially cause infringement," say Defendants, "so would every

search engine, instant messenger[,] and internet service provider." Def. Brief at 11. Yet this argument

ignores the reality of Defendants' service as compared to the search engines and instant messengers to

which they claim such similarity. A search engine does not entice its users to infringe others' copyrights.

Instant Messaging programs (like AOL IM) do not index, rank, and comment upon MP3 music for its

users to browse and copy. Aimster is different.[13]

ii.    Substantial Non-Infringing Uses

As another defense to the contributory infringement claim, Defendants argue that Aimster is

capable of "substantial non-infringing uses" as identified by the Supreme Court in *Sony Corp. of Am.*

*v. Universal City Studios*, 464 U.S. 417 (1984). In *Sony*, the Supreme Court rejected the efforts of the

entertainment industry to enjoin the sale and distribution of Betamax video cassette recorders that were

being used by their users to record copyrighted television broadcasts. Finding that the video recorders

were capable of substantial non-infringing uses, the Court declined to extend contributory liability to the

recorders' manufacturer. Defendants argue that, like the betamax video recorder, Aimster is capable of

substantial non-infringing uses. Such uses include the ability of Aimster users to transfer any number

and type of non-copyrighted files and messages to other users,[14] and the ability of users to identify other

---

[13]Nonetheless, Defendants persist in their argument that AOL IM allows for the transfer of copyrighted music just as Aimster does. This argument is more fully discussed below in Section III.B.4.

[14]In fact, during oral argument Defendants' counsel contended that a large number of the files transferred through Aimster are adult photographs rather than copyrighted music. Oral Arg. at 21.

users with similar interests, share information, and develop clubs. Def. Brief at 9. In addition, businesses without a network administrator may use Aimster to exchange business records securely and efficiently. Deep Decl. ¶ 16-18.

*Sony* is plainly distinguishable from the present case. First, in *Sony*, the court found that the *principal* use of video recorders was non-infringing (mere "time shifting"). 464 U.S. at 421. By contrast, Defendants here have provided no evidence whatsoever (besides the unsupported declaration of Deep) that Aimster is *actually* used for any of the stated non-infringing purposes. Absent is any indication from real-life Aimster users that their primary use of the system is to transfer non-copyrighted files to their friends or identify users of similar interests and share information. Absent is any indication that even a single business without a network administrator uses Aimster to exchange business records as Deep suggests. Indeed, the mere inclusion of such evidence would not suffice unless it tended to show that such use constituted Aimster's primary use. Instead, the evidence leads to the inescapable conclusion that the *primary* use of Aimster is the transfer of copyrighted material among its users.

Second, *Sony* applied only to a "staple article of commerce." 464 U.S. at 442. The Court opined that copyright law must look beyond actual duplication of a publication and look also to "the products or activities that make such duplication possible." *Id.* "Accordingly," said the Court, "the sale of copying equipment, like the sale of other articles of commerce, does not constitute contributory infringement if the product is widely used for legitimate, unobjectionable purposes." *Id.* The Court noted that contributory infringement is usually reserved for cases "involving an ongoing relationship between the direct infringer and the contributory infringer at the time the infringing conduct occurred," and observed that the Betamax VCR "plainly does not fall into that category." *Id.* at 437-8 ("[T]he only contact between Sony and the users of the Betamax . . . occurred at the moment of sale."). Here, Aimster cannot be said to be such a staple article of commerce. It is not discrete product, like a Betamax

VCR, to be sold to customers who thereafter use the machine as they see fit. Instead, Aimster is a *service* more closely akin to the swap meet in *Fonavisa*. Like the swap meet organizers in *Fonavisa*, Defendants provide an ongoing service to their users, including the provision of software, the maintenance of the Aimster system, and the continuing control of editorial content (ie. Club Aimster). Unlike the case in *Sony*, the instant case involves an ongoing relationship between the direct infringers (the users) and the contributory infringers (the Defendants).

Third, there is nothing to suggest that *Sony* extends to protect the unauthorized and widespread *distribution* of infringing works. The conduct of the Betamax users at issue was the "private, home use of VTR's for recording programs broadcast on the public airwaves without charge to the viewer." *Sony*, 464 U.S. at 425. There was simply "[n]o issue concerning the transfer of tapes to other persons." *Id.* By stark contrast, Aimster has virtually nothing to do with private, home use copying (or time shifting). Instead, Aimster makes each of its users a global distributor of Plaintiff's copyrighted music for copying by any number of other Aimster users. Much like the AHRA argument discussed above, Defendants cannot successfully contend that Aimster involves merely private, home use.

Fourth, there is authority to suggest that *Sony's* protection is not available when the products at issue are specifically manufactured for infringing activity, even if those products have substantial non-infringing uses. *See, e.g., Cable/Home Comm.*, 902 F.2d at 846 (even though "other uses" existed, defendants liable where they "utilized and advertised these devices primarily as infringement aids and not for legitimate, noninfringing uses."); *A&M Records, Inc. v. Abdallah.*, 948 F.Supp. 1449, 1456 (C.D. Cal. 1996). Here, it is our finding that Aimster is a service specifically designed to aid the infringing activities of its users and, on that basis alone, should not be eligible for *Sony's* protections.

Finally, the court in *Sony* approvingly cited the district court's finding that Sony had not "influenced or encouraged" the unlawful copies. *Sony*, 464 U.S. at 438. Aimster does not fall into this

27

category of innocent enabler. Indeed, our factual findings demonstrate that Aimster actually goes to great lengths to both influence and encourage the direct infringement among its users.

We are convinced that Defendants had knowledge of and materially contributed to the infringing activity of Aimster's users. We are further convinced that the protections of *Sony* are simply not applicable to the instant case. As such, Plaintiffs have adequately demonstrated a likelihood of success on the merits for the contributory infringement claim.

### 3.    Vicarious Infringement

Even if we were to find that Plaintiffs did not have a likelihood of success on the contributory infringement claim, we would, as an alternative, find a likelihood of success on the vicarious infringement claim. Vicarious copyright infringement is established when a defendant has "the right and ability to supervise infringing activity and also has direct financial interest in such activities." *Hard Rock Café Licensing Corp. v. Concession Services, Inc.*, 955 F.2d 1143,1150 (7th Cir. 1992) (citing *Gershwin Publ'g Corp.*, 443 F.2d at 1162). Unlike contributory liability, one can be liable for vicarious copyright infringement even without knowledge of the infringement. *F.E.L. Pub., Ltd. v. Nat'l Conference of Catholic Bishops*, 466 F.Supp. 1034, 1040 (N.D. Ill. 1978) (citing *Dreamland Ball Room, Inc. v. Shapiro, Bernstein & Co.*, 36 F.2d 354 (7th Cir. 1929)).

### a.    Right and Ability to Supervise

Defendants have the right and ability to supervise Aimster's users. On this point, the Ninth Circuit's reasoning in *Fonovisa* is again instructive.[15] In *Fonovisa,* 76 F.3d at 262, the swap meet organizers had the right to terminate individual vendors at any time and controlled the access of customers to the swap meet area. These facts, among others, were integral to the court's finding that the

---

[15]The court in *Fonovisa* addressed both contributory and vicarious infringement.

swap meet organizers had the right and ability to control the infringing activities of the vendors. *Id.* at 263.

Here, Defendants have largely the same abilities as the defendants in *Fonovisa*. Defendants, according to their own posted Terms of Service, have the right to terminate individual users. The Terms of Service state that Aimster will "take down" "infringing material" and that repeat violators of copyright law "may have their access to all services terminated." Forrest Decl. Ex. 8. Furthermore, Defendants control the access of Aimster's users. Users of the system are required to log on after paying their monthly fee to join Club Aimster. This log in requires the user to supply a "Member Name" and password. Forrest Decl. Ex. 19.

We are not convinced by Defendants' argument that, due to the encryption on the Aimster system, they do not have the ability to block user's access to the service without shutting the whole system down. Def. Brief at 11. This argument, even if it were true, would not prove that Defendants did not have the right and ability to supervise. The fact that users must log in to the system in order to use it also demonstrates that Defendants know full well who their users are. Defendants argue that Aimster's architecture prevents them from discovering the "physical internet address" of their users. Def. Brief at 11. Yet, there is nothing about the right and ability to control which requires Defendants to have such precise identifying knowledge.

b.    Direct Financial Interest

Defendants' direct financial interest in the infringing activities of its users is without question. Each Club Aimster user must pay $4.95 per month to use the service. Credible evidence (described in Section I.D.5) even suggests that *every* Aimster user must now pay this fee. Defendants solicit monetary contributions on the Aimster site to help fund their involvement in this litigation. Defendants sell various Aimster-related merchandise on their site, including Aimster "Fight For Justice" posters

apparently intended as a rallying call for the free availability of copyrighted music. In short, Aimster is very much a commercial enterprise and Defendants have a direct financial interest in the infringement by its users.

The financial benefit element is also satisfied where, as here, the existence of infringing activities act as a draw for potential customers. *See, e.g., Napster II*, 239 F.3d at 1023 ("Financial benefit exists where the availability of infringing material 'acts as a draw' for customers." (quoting *Fonovisa*, 76 F.3d at 263-264)). The facts demonstrate that Aimster's users were drawn to the service in this manner. Aimster's bulletin boards and chat rooms are replete with examples of users drawn there simply because they know it is a place where they can obtain infringing material.

Plaintiffs have thus shown a reasonable likelihood of success on the vicarious infringement claim.

### 4.    Unclean Hands

Defendants next contend that the preliminary injunction should be denied due to AOL's unclean hands. AOL, claim Defendants, "engages in the same conduct that it and the other Plaintiffs rail against here." Def. Brief at 6. Defendants argue that AOL, through AOL IM, "has now become one of the largest purveyors of file sharing in the entire world" and "provides the *exact same service* as Defendants." *Id.* at 7 (emphasis supplied). Defendants are mistaken that unclean hands should prevent injunctive relief, however, because AOL's conduct simply is not relevant to this case.

The doctrine of unclean hands prevents plaintiffs from obtaining relief for conduct in which they themselves participated. *Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 814-15 (1945). The maxim applies "to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Packers Trading Co. v. Commodity Futures Trading Comm'n*, 972 F.2d 144,148 (7th Cir. 1992). While

30

we have wide discretion to refuse to aid an unclean litigant, *Id.*, "the doctrine is not to be used as a loose cannon, depriving a plaintiff of an equitable remedy to which he is otherwise entitled merely because he is guilty of unrelated misconduct." *Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.*, 780 F.2d 589, 601 (7th Cir. 1986).

Deep's declaration provides a detailed account (including a series of screen shots) of the means by which one can download and transfer copyrighted music through AOL's service. In addition, Deep filed a supplemental declaration on this issue after the Time Warner Music Group Plaintiffs filed a separate reply brief dealing specifically with differences between AOL IM and Aimster.

These materials convince us unequivocally that Aimster and AOL IM are quite different in the means by which they allow file transfers between users. In short, Aimster's system makes the process of locating and copying an infringing file extremely easy while the file transfer capabilities of AOL's system are clearly of secondary importance. Even more important than the mere functionality of the two systems is the fact that Aimster clearly encourages, entices, and contributes to the infringement of its users (witness, for example, Club Aimster and the 'Fight for Freedom' posters), while AOL's service does nothing of the sort.

Putting aside the differences or similarities of Aimster versus AOL IM, however, there is a more important issue. Defendants go to great pains to describe the conduct of AOL, but *AOL is not even a party to this case*. At best, AOL can be described as having a tenuous relationship with only one group of Plaintiffs – the Warner Music Group Plaintiffs. As described by counsel to the Warner Music Group Plaintiffs at oral argument, "Time Warner, the AOL Time Warner parent, owns AOL" and AOL is the Internet Service Provider that owns AOL IM. Oral Arg. at 37 & Warner Reply Brief at 9. AOL, in turn, is not the owner of the Warner Music Group plaintiffs. Indeed, the only relationship between AOL and some of the Plaintiffs in this case is that some of them share a common corporate parent. *Id.*

Furthermore, even assuming *arguendo* that AOL did have unclean hands and did have some significant relationship with some of the Plaintiffs, we fail to see how that relationship would be the least bit relevant *vis-a-vis* all of the other Plaintiffs currently seeking a preliminary injunction in this case. We can find no authority to suggest that where multiple plaintiffs are seeking equitable relief, the unclean hands of one plaintiff should serve to prevent all of the other plaintiffs from receiving their due relief.

### 5. DMCA

Defendants next argue that they are eligible for the liability limitations found in the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, enacted in 1998. The DMCA was "enacted both to preserve copyright enforcement on the Internet and to provide immunity to service providers from copyright infringement liability for 'passive,' 'automatic' actions in which a service provider's system engages through a technological process initiated by another without the knowledge of the service provider." *ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 625 (4th Cir. 2001) (citing H.R. Conf. Rep. No. 105-796, at 72 (1998)).[16] This immunity is not presumptive, but granted only to "innocent" service providers who can show that they do not have a defined level of knowledge regarding the infringement on their system. *Id.* The DMCA's protection of an innocent service provider disappears "at the moment the service provider loses its innocence, i.e. at the moment it becomes aware that a third party is using its system to infringe." *Id.* Liability protection under the DMCA is an affirmative defense and, as such, Defendants bear the burden of establishing its applicability.

The DMCA provides internet service providers with four possible safe harbors from liability for direct, vicarious, and contributory copyright infringement. The first safe harbor, § 512(a) (the

---

[16]Given the DMCA's relatively recent enactment, there is a dearth of Seventh Circuit precedent interpreting its provisions.

"Transitory Communication Safe Harbor"), applies in certain situations where liability would otherwise be predicated on the service provider's providing connections for infringing material through its network. The second safe harbor, § 512(b) (the "System Caching Safe Harbor"), provides a limitation on liability in certain circumstances for the intermediate and temporary storage (or caching) of material on the service provider's system. Both parties agree that the third safe harbor, § 512(c), is not relevant in this case. The fourth safe harbor under the DMCA, § 512(d) (the "Information Location Tools Safe Harbor"), provides for a limitation on the liability of service providers who, under certain circumstances, refer or link users to infringing material or infringing activity.

The applicability (or inapplicability) of the DMCA's safe harbor provisions does not affect the availability of any other defense under the Copyright Act, such that service providers are free to establish defenses in addition to, and independent from, the DMCA provisions. 17 U.S.C. § 512(l). Furthermore, the DMCA specifically sets forth that the applicability of its safe harbor provisions are not conditioned upon a service provider "monitoring its service or affirmatively seeking facts indicating infringing activity." 17 U.S.C. § 512(m). In this way, the DMCA represents a legislative determination that copyright owners must themselves bear the burden of policing for infringing activity – service providers are under no such duty.

Before a service provider can take advantage of the safe harbor provisions, it must satisfy two threshold determinations. First, the potential defendant must meet the DMCA's definition of "service provider." Second, the potential defendant must adopt and reasonably implement a policy which terminates the access of users who are identified as repeat infringers. Each of these threshold determinations are examined in turn.

a.   Service Provider

The DMCA defines "service provider" in two different ways, depending upon which safe harbor

33

is at issue. For the purpose of the Transitory Communication Safe Harbor, "service provider" is defined as "an entity offering the transmission, routing, or providing of connections for digital online communications, between or among parties specified by a user, of material of the user's choosing, without modification of the content of the material as sent or received." 17 U.S.C. § 512(k)(1)(A). For the purposes of the remaining safe harbors, the "service provider" definition is even more broad: a service provider is "a provider of online services or network access, or the operator of facilities therefor." 17 U.S.C. § 512(k)(1)(B). The second definition further provides that it includes any entity that qualifies under the first definition. *Id.*

A plain reading of both definitions reveals that "service provider" is defined so broadly that we have trouble imagining the existence of an online service that *would not* fall under the definitions, particularly the second. In any event, Aimster certainly qualifies under the first version (and, by extension, the second). As described by Defendants,

> Aimster connects digital signals from one user to another so that they may identify each other as "buddies" or for the purpose of sending information and data from one user to another. The material to be sent and the "buddies" are chosen wholly by the user without modification by Defendants. . . . Aimster operates in the standard way that many infrastructure providers do, such as providers of email gateways, instant messaging and caching servers, by providing a backbone or infrastructure through a contractual relationship with other intermediate service providers, who in turn have commercial relationships with other infrastructure providers on down the line to the provider that has a relationship with the end user.

Def. Brief at 14. This description (uncontroverted by Plaintiffs) plainly shows that Aimster is a service provider under the DMCA's definition in that it provides the routing of digital communication between its users. Plaintiffs retort that internet service providers "generally provide a way to connect to the Internet (e.g., phone or cable modem) as well as a mechanism that tells a computer how and where to access information on the Internet," and that Aimster provides none of these services. Farmer Decl. ¶ 28. Plaintiffs are probably correct that Aimster would not be considered an internet service provider

under the commonly accepted usage of that term. However, the DMCA has provided two specific definitions of "service provider" and those broad definitions must control.

      b.    Repeat Infringer Policy

The second threshold determination of an entity's eligibility for the DMCA's safe harbors is the adoption and reasonable implementation of a policy to disable the access of repeat infringers. 17 U.S.C. § 512(i)(1)(A) states in part that the DMCA's liability limitations shall apply to a service provider only if the provider "has adopted and reasonably implemented, and informs subscribers and account holders of the service provider's system or network of, a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." Defendants cannot jump this hurdle.

Aimster has adopted a repeat infringer policy. The copyright notice on the Aimster site informs users that they "respect copyright law and expects our users to do the same." Forrest Decl. Ex. 8 (screen shot of Aimster copyright notice). The copyright notice goes on to provide a detailed form that an aggrieved copyright owner can fill out to identify the work that is being infringed and the "user name under which such material is available through the AbovePeer service, and the path and the file name." *Id.* The notice goes on to explain the procedure for taking down or disabling access to the infringing material and the procedure for reestablishing access in the event of a mistake.[17] Finally, the notice provides that "uses who are found to repeatedly violate copyright rights of others may have their access to all services terminated." *Id.* These facts support a finding that Aimster has adopted a repeat infringer policy.[18]

---

[17]The copyright notice appears to track the irrelevant (for our purposes) notice, take-down, and counter notice procedures of § 512(g).

[18]It is, as we shall see, an absolute mirage, but it is a stated policy nonetheless.

The problem, Plaintiffs and Defendants agree, is in the method the repeat infringer policy is *implemented* – that is to say, the policy is *not* implemented. Where the parties differ is as to what significance we should attach to this lack of implementation. Defendants point out, and we are inclined to believe them, that the policy is not implemented because it *cannot* be implemented. As described in Section III.B.2.a, *supra*, the encryption on Aimster renders it impossible to ascertain which users are transferring which files. Thus, while Plaintiffs have identified many Aimster users who may have copyrighted works residing on their individual hard drives (itself probably not an infringing activity), Plaintiffs cannot demonstrate that any particular user is actually *transferring* any of those files (which *would* be an infringing activity). Defendants point out that the Plaintiffs have yet to identify a single repeat infringer whose access should be terminated. Indeed, say Defendants, once they "are notified that a particular internet protocol address is identified with any infringing use, Defendants will notify the primary internet service provider to terminate their access." Def. Brief at 16. This statement is not nearly so helpful and agreeable as it seems, however, because, according to Defendants themselves, such identification would be impossible.

We are not convinced by Defendants' arguments on this issue for two reasons. First, we note that the repeat infringer language of §512(i) does not require a copyright holder to provide the sort of notice sought by Defendants. Nowhere in that subsection is there the requirement that a copyright holder provide the Defendants with the internet protocol address of a particular copyright infringer on the Aimster system. Rather, the statute merely provides that the service provider implement a policy that provides for the termination of access to repeat infringers in "appropriate circumstances." 17 U.S.C. § 512(i). Second, as noted previously in this opinion, we remain nonplused with Defendants' argument that the Aimster encryption scheme absolves them of responsibility when that scheme is voluntarily instituted by the Defendants themselves. Adopting a repeat infringer policy and then purposely

eviscerating any hope that such a policy could ever be carried out is not an "implementation" as required by § 512(i).

Defendants' failure to comply with § 512(i) renders them ineligible for any of the DMCA's safe harbor protections. Nonetheless and for the sake of completeness, we will briefly address the relevant safe harbors arguments and Defendants' ineligibility for each.

c.     Transitory Communications Safe Harbor

The Transitory Communications Safe Harbor holds that a service provider shall not be liable for copyright infringement by "reason of the provider's transmitting, routing, or providing connections for, materials *through* a system or network controlled or operated by or for the service provider . . ." provided a number of conditions are satisfied. 17 U.S.C. § 512(a) (emphasis supplied). Noting that the safe harbor specifically requires the putatively infringing material be routed or transmitted *through* the Aimster system, Plaintiffs argue that Aimster would not qualify. We agree. According to Deep, the Aimster system works by allowing users to communicate and transfer files via "privately created network[s.]" See Deep Decl. ¶ 4. Aimster is a "peer-to-peer service," Oral Arg. Tr. at 18, that is, it allows for the transfer of information directly between one user and another user through the Internet. If the transaction between the users is truly peer-to-peer, then the information transferred between individual users does not pass "through" Aimster's system at all. *See, e.g., A&M Records v. Napster*, No. C 99-05183, 2000 WL 573136 (N.D. Cal. 2000) ("even if each user's Napster browser is part of the system, the transmission goes *from* one part of the system *to* another, or *between* parts of the system, but not 'through' the system."); Farmer Decl ¶ 28 ("Aimster has been designed so that the download itself does not pass through Aimster's own servers."). In this way, Plaintiffs urge that the word "through" in the statute should be read to mean "as a conduit."

Defendants, in their brief, do not directly disagree with Plaintiffs' argument that material does not pass through Aimster's own servers. Instead, Defendants argue that "through" should be given a broader meaning, such as "be means of" or "by the help or agency of." Def. Brief at 14. Defendants' brief tacitly accepts that Aimster could qualify for the Transitory Communications Safe Harbor only if we were apply these broader definitions of "through." The legislative history, however, reveals that Plaintiffs' interpretation is correct: the Transitory Communications Safe Harbor is limited to situations "in which a service provider plays the role of a 'conduit' for the communications of others." H.R. Rep. No. 105-551(II) (1998), *reprinted in* 1998 WL 414916, *130. Aimster cannot fairly be said to be a mere "conduit" of the information transferred between its users. The system provides broad search capabilities to its users, allows for the automatic resumption of interrupted downloads, provides for easy one-click downloading of the system's most popular titles, and offers editorial comment on popular titles. These features do not a mere conduit make.[19]

### d. System Caching Safe Harbor

The System Caching Safe Harbor holds that a service provider shall not be liable for copyright infringement "by reason of the intermediate and temporary storage of material on a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(b)(1). Defendants provide ample explanation of how and why certain information is cached on their system. See Deep Decl. ¶ 14.[20] However, Defendants' brief reveals a fundamental misunderstanding of the nature of the System Caching

---

[19]Defendants would not be eligible for the Transitory Communications Safe Harbor for an additional reason. § 512(a)(5) requires that material be "transmitted through the system or network *without modification of its content.*" However, by Defendants' own admission, Aimster *does* modify the content: "Aimster encrypts all the information that is transferred between users." Deep Decl. ¶ 8. This modification further belies the notion of Aimster as a mere conduit.

[20]Notably, however, Deep's declaration is careful to avoid claiming that Aimster ever caches the actual infringing files. He instead refers to "data," "messages," and "attributes." Deep Decl. ¶ 14.

Safe Harbor. Defendants assert that the System Caching Safe Harbor "provides a safe harbor to service providers that temporarily store material on a system and meet certain other conditions." Def. Brief at 16. Apparently, Defendants believe that the safe harbor protects service providers from liability for copyright infringement *so long as* the material in question is cached on the system. Yet, the language of the safe harbor is quite clear that the liability limitation applies to liability that may arise *"by reason of"* the caching of material. 17 U.S.C. § 512(b)(1) (emphasis supplied).

The difference between these two interpretations is substantial. By Defendants' reading of the safe harbor, a service provider is cleansed of liability for infringing material whenever, during a transfer of material between its users, the material in question happens to be cached on the service provider's system. That reading is an impossibly broad interpretation of the safe harbor. Instead, the plain language of the safe harbor provides that a service provider, having met the other requirements of the safe harbor, is safe from liability *when that liability results from the act of caching itself.*

Here, Plaintiffs do not assert that Defendants are liable as a result of the caching of material of their system. Rather, Defendants' putative liability is a result of their material contribution to the infringing activities of others. The System Caching Safe Harbor is simply not applicable in this case.[21]

    e.    <u>Information Location Tools Safe Harbor</u>

The Information Location Tools Safe Harbor provides that a service provider shall not be liable "by reason of the provider referring or linking users to an online location containing infringing material or infringing activity, by using information location tools, including a directory, index, reference,

---

[21]Defendants would not be eligible for the System Caching Safe Harbor for two additional reasons. First, just like the Transitory Communications Safe Harbor, the System Caching Safe Harbor requires that the material in question be transmitted "through" the Aimster system, § 512(b)(1)(B), when it is not. Second, the material must be transmitted without modification to its content. § 512(b)(2)(A). As noted above in footnote 19, however, Aimster's encryption scheme belies this assumption.

pointer, or hypertext link," if the service provider meets three other specified conditions. 17 U.S.C. § 512(d).

Defendants fail to meet the conditions outlined by the Information Location Tools Safe Harbor. First, a service provider cannot have actual knowledge of the infringing material or activity, or, in the absence of actual knowledge, the service provider cannot be aware of facts or circumstances from which the infringing activity is apparent. 17 U.S.C. § 512(d)(1). In the alternative, if a service provider does have actual or constructive knowledge, the service provider must "act[] expeditiously to remove, or disable access to, the material." 17 U.S.C. § 512(d)(1)(C). As described in Section III.B.2.a, however, Defendants do have actual and constructive knowledge of the infringing activity. Furthermore, there is no evidence whatsoever that Defendants have taken steps to remove or disable access to infringing material.

Second, a service provider cannot "receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity." 17 U.S.C. § 512(d)(2). As more fully described in Section III.B.3, however, we find that Defendants do receive the sort of financial benefit described by this condition and Defendants do have the right and ability to control the infringing activity (even if they purposely avoid such ability through a self-imposed encryption scheme).[22]

---

[22]The third condition of the Information Location Tools Safe Harbor requires the expeditious take-down of infringing material after the service provider receives proper notice from the copyright holder that complies with § 512(c)(3). Because Defendants do not meet the first two conditions, however, we find it unnecessary to delve into this third condition. We note in passing, however, that the notice requirements of § 512(c)(3) probably have not been met by Plaintiffs. The RIAA sent its notice of infringement and cease and desist letters to Deep personally. However, the DMCA contains a technical requirement that such notice be sent to a service provider's designated agent. *See* 17 U.S.C. § 512(c)(2) & (3). Defendants' designated agent to receive such notification appears to be Melissa Fass of AbovePeer, not Deep. *See* Forrest Decl. Ex. 8 (screen shot of Aimster Copyright Notice page providing contact information for designated agent Melissa Fass).

## C. No Adequate Remedy at Law and Irreparable Harm

In the context of a preliminary injunction, we must consider the equitable defense of laches as a mitigating factor with regard to Plaintiffs' claim of irreparable harm. While irreparable harm may normally be presumed in the copyright infringement context, *Atari, Inc. v. North Am. Phillips Consumer Elec. Corp.*, 672 F.2d 607, 620 (7th Cir. 1982) , that presumption can be overcome when the Plaintiff is inexcusably tardy in seeking relief and such tardiness weighs against the Plaintiffs' claim of irreparable harm. *See, e.g., Ideal Industries, Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025 (7th Cir. 1979), *cert. denied*, 447 U.S. 924 (1980).

In assessing the excusability of delay in seeking a preliminary injunction, the relevant issue is whether a defendant has been "lulled into a false sense of security or had acted in reliance on the plaintiff's delay." *Ty, Inc.*, 237 F.3d at 903. In *Ty*, the manufacturer of the popular "Beanie Babies" toys sought to preliminarily enjoin the manufacture and marketing of confusingly similar "Beanie Racers" toys. In addressing the defendant's argument that the plaintiffs waited too long to bring their motion, the Seventh Circuit affirmed the magistrate judge's decision that "it cannot be said that this minimal [eight month] delay lulled Defendant into a false sense of security, nor that the delay was unreasonable." *Id.* Of note was the dearth of "affirmative evidence that [Plaintiffs'] delay . . . caused [Defendant] to be lulled into a false sense of security or that [Defendant] in any way relied on [Plaintiff's] delay." *Id.*

We are therefore instructed to search the record before us for any affirmative evidence that the Defendants in this case were lulled into a false sense of security or relied on Plaintiff's delay in continuing their operations. Like the court in *Ty*, we find such evidence to be wholly lacking.

The parties agree that Plaintiffs became aware of the Aimster system around August or September 2000. The present motion for preliminary injunction was filed with this court on December 21, 2001, about sixteen or seventeen months later. Such a lengthy delay, however, is not dispositive in

and of itself because the issue is not merely the exact number of days between an injury and a motion. Rather, the delay must be assessed in the context of the parties' situation and in its affect on the Defendants.

Examined in the context of the parties' situation, the delay suddenly seems less objectionable. In his declaration, Deep catalogues various contacts he had with some of the record company plaintiffs in the months following Aimster's release. He asserts that he met with several product managers of AOL on September 3, 2000 to discuss the possibility of a business relationship between Aimster and AOL. Deep Decl. ¶ 26. On October 2000, Aimster formed a business relationship with EMI/Capital Records (one of the Plaintiffs) to market the copyrighted work "Radiohead – Kid A." Furthermore, Deep alleges that representatives of Aimster held at least four separate meetings with representatives of Bertelsmann AG (a RIAA member) to discuss possible investments in Aimster.[23] Deep claims that in these discussions he explained in detail how Aimster worked and how music could be distributed in encrypted form over the Aimster system. Deep Decl. ¶ 28. During this entire period from approximately August 2000 to March 2001, according to Deep, neither the RIAA nor any of its members raised any issues with regard to the Aimster's alleged copyright infringement. Deep Decl. ¶ 29. The rattling of legal sabers began on April 3, 2001, according to Deep, two weeks after a senior executive for Transworld Entertainment Corp., a retailer of musical recordings, contacted Edgar Bronfman of Vivendi/Universal about the possibility of Transworld selling musical recordings through Aimster under a license from the

---

[23]There is dispute as to whether these meetings took place. Plaintiffs have filed a Declaration by Deirdre McDonald, Vice President of Legal and Business Affairs for BMG Music in which Ms. McDonald refutes Deeps assertion that anyone from the Bertelmann New Media Group or Bertelsmann Random House New Media Group ever met with Aimster to discuss possible investment. McDonald Decl. ¶ 2. Deep thereafter filed a supplemental declaration further describing his meetings with members of Bertelsmann and Random House staff and attaching various e-mails that appear to discuss the scheduling of meetings between Aimster and Bertelsmann. Notwithstanding Ms. McDonald's declaration, we have little doubt that Deep met with some if not all of the parties as he has described. We do doubt, however, that these meetings have any relevance vis-a-vis Plaintiffs' delay.

major record companies. Deep Decl. ¶ 29. On April 3, 2001, the RIAA sent its first of two cease and desist letters to Defendants threatening legal action unless Defendants took steps to eliminate the rampant copyright infringement on Aimster system. Thereafter, Defendants commenced their own declaratory judgment actions in the Northern District of New York and the procedural history of this case commenced in manner outlined above in Section II culminating, in November 2001, with all actions consolidated and transferred to this court for pretrial proceedings. Even fully accepting Defendants' recitation of events, it is obvious that the actual relevant period in our analysis of the Plaintiff's delay is from August 2000 to April 3, 2001 – eight months rather than seventeen. Defendants could not and cannot claim that they were lulled into a false sense of security or reasonably relied upon Plaintiff's delay after April 3, 2001 because it is on that date that they definitively became aware of Plaintiff's intentions. After all, the April 3, 2001 cease and desist letter specifically notified Defendants that continued infringing activities on the Aimster system may force the RIAA to "seek additional legal remedies." Creighton Decl., Ex. 8. Such additional legal remedies undoubtedly included, in due course of time, a motion for preliminary injunction or other equitable relief. *See, e.g., Ty, Inc. v. Softbelly's, Inc.*, No. 00-C-5230, 2001 WL 125321 *8 (N.D. Ill. 2001) (Norgle, J.) ("[T]he very fact that Ty sent a cease and desist letter should have placed Softbelly on notice that the instant action and motion could result."). Therefore, the time period between April 3, 2001 and the eventual filing of the preliminary injunction is simply not relevant to our analysis of the appropriateness of Plaintiffs' delay in seeking the preliminary injunction.

In assessing whether Defendants were lulled into a false sense of security, we therefore need only focus on the happenings in the time period between August 2000 and April 3, 2001. For their part, Plaintiffs contend that until March 2001 the Aimster system was difficult to ascertain because it was prone to technical problems and frequently inaccessible for lengthy periods. Pla. Reply at 11. In a

43

supplemental declaration, Frank Creighton, Executive Vice President and Director of Anti-Piracy for the RIAA, states that during the months following September 2000 when his staff became aware of the Aimster system, their attempts to monitor the system were thwarted by Aimster's technical problems. In fact, he says, "there were days (and even weeks) during which we could not log on to the system." Creighton Supp. Decl. ¶ 3. Screen shots of the Aimster web page during this time support Plaintiffs' contention that the service was prone to technical problems. Dated news updates on the web site specifically refer to "connection hassles and download glitches" on October 17, 2000 and promising that "a new version of Aimster is on the way." Forrest Decl. Ex. 3. The web page further notified Aimster users on November 17, 2000 that service would be suspended pending the release of a new version of the software. *Id.* According to the screen shots of Aimster's own web page, that new version was not released until February 2, 2001. *Id.* ("Long Awaited AIMSTER 3 Debuts!").

Defendants reject the notion that Plaintiffs were unaware of the Aimster system prior to March 2001. They point to the many contacts and meetings (described above) they had with various representatives of the Plaintiffs. But the contacts that Defendants describe are not evidence that Plaintiffs were fully aware of the Aimster system or what it would become nor are they evidence that Plaintiffs were implicitly condoning Defendants' activities. At best, it seems clear that Plaintiffs, prior to April 3, 2001, were intrigued by Aimster and trying learn more about it. See, e.g., Mujica Decl. ¶ 23. Discussions of possible investment, even if true, are not, by themselves, sufficient to lull Defendants into a false sense of security. Deep furthermore makes much of the business relationship between Aimster and EMI/Capital Records. This "relationship," however, consisted solely of an agreement to place an advertisement for Radiohead on the Aimster web page and a hyperlink to the EMI web page. Deep Decl. ¶ 27. Despite what Defendants may argue, this "relationship" as such was hardly a definitive indication that EMI/Capital Records knew about and condoned the wide scale unauthorized transfer of Plaintiffs'

copyrighted works, nor was the advertisement a reasonable indication to Defendants that they were safe from liability.[24]

Finally, Defendants have repeatedly referred to a newspaper quotation in which Barry Schuler, chairman and Chief Executive of America Online Inc., says that Aimster is "not doing anything illegal." Deep Decl. Ex. D. Defendants imply that this assertion contributed to their false sense of security and indicates Plaintiffs' full knowledge of Aimster activities as early as February 2001. Deep Decl. ¶ 26 and Oral Argument Tr. 25. Assuming for a moment that the quotation attributed to AOL (which is not directly a party to this action) is both relevant and admissible, it is taken grossly out of context. Defendants would have us believe that AOL's chairman was explicitly condoning the illegal distribution of copyrighted music over the Internet through the Aimster system. However, it is quite clear from the context of the Washington Post article at issue that Mr. Schuler was referring specifically to Aimster's activity of piggybacking onto the AOL IM network and noting that the piggybacking practice was not itself illegal.[25] The mischaracterization of Mr. Schuler's words does not help Defendants' cause.

Plaintiffs' delay in bringing the motion for preliminary injunction was not unreasonable and is not enough the rebut the presumption of irreparable harm. Furthermore, there is insufficient affirmative evidence that Defendants were lulled into a false sense of security or that they reasonably relied on Plaintiffs' delay in assuming that a day of legal reckoning would somehow never come. In short, it is

---

[24]Indeed, Ted Cohen, Vice-President for New Media for EMI, had filed a declaration further describing the relationship between EMI and Defendants. He recounts a meeting with Deep at which Deep sought business from the record companies by trumping up Aimster's ability to protect copyrights. The agreement reached between EMI and Defendants as a result of this meeting was a mere linking arrangement in which no money changed hands. *See* Cohen Decl. ¶ 2-4.

[25]This obvious interpretation is supported by Mr. Shuler himself. *See* Shuler Decl. ¶ 3 ("This statement simply meant that the act of piggybacking on the AOL IM service did not appear to constitute a trespass of the AOL network.").

inconceivable that Defendants' had any *reasonable* belief that Plaintiffs' would not take all appropriate action to protect their intellectual property.

## D.    Balance of Hardships and Public Interest

The next step in the preliminary injunction analysis is to "consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied." *Ty, Inc.*, 237 F.3d at 895. This step requires us to engage in a "sliding scale approach; the more likely the plaintiff will succeed on the merits, the less the balance of irreparable harms need favor the plaintiff's position." *Id.*

Defendants urge that the balance of hardships tips in their favor because a preliminary injunction would preemptively destroy their business before they had the opportunity for a full hearing on the merits. Defendants' argument, however, distorts the meaning of the balance of hardships test. If we were to accept the going-out-of-business argument, a blatant copyright infringer "would be encouraged to go into an infringing business because it can later argue to a court that enjoining the blatant infringement would sink the business." *See Horn Abbott Ltd. v. Sarsaparilla Ltd.*, 601 F.Supp. 360, 369-70 (N.D. Ill. 1984) (Aspen, J.). We do not accept such reasoning. Defendants further argue that, because Aimster represents such a small portion of the total amount of the file sharing traffic on the Internet, Plaintiffs would not suffer any hardship without an injunction. This argument is specious, however, given our (here unrebutted) presumption of irreparable harm.

Using the sliding scale approach, therefore, we find that the balance of hardships tips in favor of Plaintiffs. This finding is especially apt considering our belief that Plaintiffs have an exceptionally strong likelihood of success on the merits of their contributory infringement claim.

The preliminary injunction analysis also requires us to "consider the public interest (non-parties) in denying or granting the injunction." *Ty, Inc.*, 237 F.3d at 895. Defendants urge that the public will

be harmed "by the overextension of copyright laws." Def. Brief at 20. However, given our finding regarding Plaintiffs likelihood of success of the merits, we do not agree that a preliminary injunction in this case will result in such an overextension. To the contrary, the public interest is served by upholding copyright protections against those who would seek to misappropriate protected works.

## IV. CONCLUSION

For the foregoing reasons, we grant the Plaintiffs' motion for preliminary injunction. Plaintiffs are hereby ordered to submit proposed language for the preliminary injunction within 5 business days of this opinion. Defendants thereafter have two business days with which to submit any response to the proposed language. Plaintiffs' submission should be narrowly tailored, to the extent possible, to achieve the primary goal of preventing Defendants' continuing contributory infringement of Plaintiffs' copyrighted works while allowing non-infringing uses of the Aimster system, if any, to continue. To this end, and by way of example, we invite the parties to study the Ninth Circuit's reasoning and proposed modifications to the injunction in the Napster case, *Napster II*, 239 F.3d at 1027-1028 (Section VIII), and the resulting modified injunction from the district court. *A&M Records, Inc. v. Napster, Inc.*, No. C 99-05183, 00-1369, 2001 WL 227083 (N.D. Cal. March 5, 2001). Like Napster, Aimster presents a unique problem with regard to the identification of infringing material and the transitory nature of its end-users. Plaintiffs' submission should reflect a sensitivity to these issues by including a practical method by which they can be overcome.

Pursuant to Rule 65(c), we also order Plaintiffs to post a bond for the sum of $500,000 to compensate Defendants for their losses in the event this injunction is reversed or vacated.

It is so ordered.

MARVIN E. ASPEN
United States District Judge

Dated: 9/4/02